SARTAIN, Judge.
Plaintiff Smith Alpha instituted this action against his alleged employer to recover compensation for services rendered during the period of March 1, 1967, through April 18, 1968, either on the ground of contract or on the equitable ground of quantum meruit.
The trial judge found that, although no contract had been proved, plaintiff was entitled to a judgment based on quantum meruit in the amount of $11,616.00. The defendant appealed contending that the doctrine was inapplicable to the facts in this case and alternatively that the amount of the award was excessive and not supported by sufficient proof in the record. The finding that there was no contract is not contested on appeal. We affirm the judgment of the trial court.
The trial judge set out extensive findings of facts relative to the relationship between these litigants prior to the period in dispute in this suit. These facts are not seriously contested for the most part and we quote from that portion of the trial judge’s written reasons for judgment:
“ . . . After working for many years in the shipyard business, Mr. Alpha went to work in 1944 for Mr. (Arthur) Acker-man, the owner of Oyster Shell Products Corporation, and has been in the oyster shell grinding business ever since. Eventually, Mr. Alpha became Manager of Laminar Corporation, also owned by Mr. Ackerman, and engaged in grinding oyster shells at its plant in Berwick, St. Mary Parish, Louisiana. Mr. Alpha sometimes did extra work for Mr. Ackerman and on three occasions received sums of $5,000.00, $10,000.00 and $15,000.00 for building marine equipment, etc., for Mr. Ackerman.
“Beginning in 1962, Mr. Alpha undertook to develop an improved classifier, a machine designed to separate ground oyster shells and materials into various grades of product, and developed a successful marketable machine in 1963. A picture of the classifier is filed as P-3 showing that it is a complex and valuable piece of machinery.
“For his work in developing the first machine, Mr. Alpha was paid $5,000.00 on March 26, 1963. Also, in 1963, Air Sifters, Inc., was organized with five shareholders including Mr. Alpha and Mr. Ackerman, each owning 20%. This corporation was formed for the purpose of manufacturing and selling the classifier that had been developed by Mr. Alpha. All of the work was done by Mr. Alpha, his nephew, Brian Alpha, and a helper at a separate building located on the Laminar Corporation premises.
*103 “In September of 1964, Air Sifters paid Mr. Alpha $7,500.00. This payment was made for Mr. Alpha’s work in building’ the three machines sold on December 2, 1963, January 4, 1964, and February 5, 1964, respectively. Mr. Alpha continued to build classifier machines for Air Sifters, Inc., and in fact built every machine ever built by Air Sifters, although the only compensation he has ever received was the $7,-500.00 payment in 1964.
“It should be noted here that Mr. Alpha is seeking compensation only for those services performed for defendant between the dates of March 1, 1967, and April 19, 1968, for the construction of ten complete machines and the partial, 75% completion of an eleventh machine.
“Mr. Ackerman died in 1965, and, because of Mr. Alpha’s close personal relationship with Mrs. Ackerman, who was a semi-invalid, he made no claim for extra compensation for the work done for Air Sifters until after Mrs. Ackerman’s death in March, 1967. Following Mrs. Acker-man’s death, Mr. Alpha continued to discuss from time to time with Mr. (Edwin) King and others the matter of his compensation for building the machines. From the time of Mr. Ackerman’s death (1965) to the date of the trial, Mr. Alpha built a total of eighteen classifier machines in Berwick with his small crew. From the time of Mrs. Ackerman’s death in March of 1967, Mr. Alpha built ten machines and completed 75% of the eleventh machine for a total sales value of $211,200.00. The sales price on the classifiers ranged from $9,000.00 to $20,265.00, depending upon size and model. The direct cost of building the machines, not including the value of Mr. Alpha’s services or the sales charge of 30%, varied from $8,000.00 to $9,000.00.
“Mr. Alpha’s work consisted of all of the engineering on the machines, design of improvements and important aspects of actual construction. He also closely supervised construction by the other workers and handled customer relations, including installation, start-up and specialized design. His work for Air Sifters required considerable travel all over the United States. When Laminar Corporation was still operating, Mr. Alpha’s travel expenses were paid by that corporation and Laminar in turn charged the expenses to Air Sifters. However, Mr. Alpha’s last few trips were paid for by Air Sifters.
“The status and structure of Air Sifters, Inc. is particularly pertinent in considering Mr. Alpha’s claim for compensation. Mr. King was President, Mr. Norton, who handled sales for a commission of 30%, was a Vice-President, and Mr. Kuzmik was also a Vice-President. Mr. Kuzmik helped build the first experimental model but since then has only occasionally given personal help to Mr. Alpha. After Mr. Ackerman died, his stock was acquired by Mr. King, thus giving Mr. King 40% of the corporate stock.
“Although Mr. Alpha continually made demands, beginning right after Mrs. Acker-man’s death, upon the other members of the Board of Directors for some agreement as to the amount of his compensation for the work done by him for Air Sifters, no agreement was ever made. Although Mr. Alpha did not keep specific time records, he estimated that each machine constructed required about one hundred hours of his time, including supervisory work, design, travel, work and construction. Of this one hundred hours, ten percent was while he was on duty working for Laminar or its successor and ninety percent was on his own, personal, off-duty time.
“While Mr. Alpha worked for Laminar Corporation as Plant Manager, he was not paid a fixed salary, but was paid amounts ranging from $12,000.00 to $20,000.00. In 1966, Mr. Alpha received a salary from Laminar Corporation of $14,000.00, plus $80.00 per month for travel expenses. The same salary was paid in 1967. Mr. Alpha’s salary with Calcite is $14,000.00 a year, plus automobile expenses. [Calcite Corporation bought out Laminar in November of 1967 *104 and Mr. Alpha continued to work for Calcite.] No deductions were made for time spent on building classifiers for Air Sifters.
“The incorporation of Air Sifters was not completed through issuance of stock until after Mr. Ackerman died, and Mr. Alpha did not know that he was the owner of any stock in Air Sifters until he received his certificates in 1966. All shares were given to the shareholders by Mr. Ackerman or his estate.
“Mr. King operated Air Sifters’ office in Greenwich, Connecticut, and was also President of Laminar Corporation in 1966.
“Laminar Corporation paid all the bills on labor and material in constructing the machines in Berwick and charged Air Sifters’ account. In 1967, the financing method was changed and invoices for materials were forwarded directly to Air Sifters without being paid by Laminar Corporation. When Calcite bought Laminar Corporation in November of 1967, Air Sifters owed Laminar Corporation some $79,000.00, which has since been reduced by the proceeds of classifier sales to $1,100.00.
“Mr. Alpha worked on the classifiers during the day, at night and on Sundays. About ninety per cent of the time he spent on the machines was on his time off from his work for Calcite. Each machine required about one hundred hours of Mr. Alpha’s time. It was definitely understood by Mr. Alpha that his salary of $14,000.00 for work done for Laminar (or Calcite) did not include any work to be done for Air Sifters. Mr. Alpha explained that the billing arrangement between Calcite and Air Sifters was to enable Air Sifters to continue to build machines in order to liquidate its $79,000.00 debt to Calcite. The labor charges made to Air Sifters by Calcite were for work done by Brian Alpha, Clarence Granger and occasionally another man. Time records were kept on their time, and they were paid one check by Calcite for work done for Calcite and Air Sifters.
“Mr. King, however, testified that it was his feeling that Mr. Alpha’s duties as Vice-President called for him to superintend the manufacture of the machines, but Mr. King did not say that this work was to be uncompensated. Mr. King testified that Air Sifters had no credit standing and, therefore, Laminar Corporation was used to finance the manufacture and purchase of materials for the machines. He expressly admitted that he never did tell Mr. Alpha that he would not be paid. He admitted discussing compensation with Mr. Alpha in June of 1967 and again in January, 1968. Also, in November, 1967, after the sale to Calcite, Mr. King suggested a possible commission basis, or a per machine basis, or a salary, but no agreement was reached.”
The trial judge did not hesitate to find that Mr. Alpha’s work resulted in a tremendous benefit to Air Sifters — without him there would have been no classifiers made by the company because he was the only one capable of doing the required special engineering design work, supervision, actual construction work on critical parts, installation and start-up work, customer relations and service.
The gravamen of the defendant’s argument on appeal is that recovery on the ground of quantum meruit is not available to an officer and director of a corporation where there was no specific agreement made before the services were rendered.
The trial judge relied on the case of Alexander v. Lindsay, 152 So.2d 261 (4th La.App.1963, writs ref. 1963) and we agree that that case contains an extensive discussion of the principles involved. In that case, the court was concerned with the validity of compensation payments made to three officers of a corporation after they had rendered certain services and found a distinction between those services which were within the line of ordinary executive duties and those services which were unusual or extraordinary allowing compensation to be paid for the latter. Compensation was not allowed for the president’s efforts in trying to find salesmen who would sell campsites on commission, nor for the secretary’s as *105 sistance in those efforts, because the court found that this was within the scope of a president’s ordinary, official duties. On the other hand, the surveying services performed by a vice-president who was an engineer, were held to be clearly outside of his duties either as an officer or director, and his compensation was allowed. The authority relied upon by the court in that case is equally applicable to the instant case:
“ ‘ * * * according to the great weight of authority, if a director or other officer renders services clearly outside of his duty as such, at the request of the corporation or board of directors, with the understanding that they are to be paid for, the law will imply a promise to pay what they are reasonably worth, and in such cases it is not necessary that there be a special agreement to pay, or precedent resolutions, charters provisions and the like, providing for compensation. And using capital assets of a corporation for the payment of wages to directors for services outside their regular duties as directors is not illegal * * * Fletcher Cyclopedia of Corporations, Vol. 5, Ch. 16, Sec. 2114, p. 494.
We find that the understanding that Mr. Alpha was to be compensated for his work was present when Mr. Ackerman paid him $5,000.00 for the original development and thereafter when Air Sifters paid him $7,500.00 after the first three marketable machines were sold. Even Mr. King testified that he thought Mr. Alpha might be entitled to some basis of compensation but that an arrangement satisfactory to all parties was not reached. Mr. Alpha’s work was hardly of a nature normally described as executive duty and was more akin to the compensable engineering services rendered by the vice-president in the Alexander case, supra.
The defendant, Air Sifters, also contends that evidence did not support the amount of the award made by the trial judge. The judge rejected two formulae suggested by Mr. Alpha, both of which used the $7,500.00 figure paid to him in 1964 and related it to either the sales price or the total value of the machines built during that period. By either formula, Mr. Alpha would have been entitled to a much greater award than he received. The formula used by the trial judge was based on an hourly rate of $12.00. This rate was multiplied by the number of hours Mr. Alpha estimated he spent during the contested period, less ten per cent thereof representing his hours spent while on duty with Laminar or Calcite. The hourly rate was reached by comparing the worth of Mr. Alpha’s services with that of his assistant, Mr. Brian Alpha, who was paid $6.00 per hour and $9.00 per hour for overtime. Recognizing the difficulty in obtaining corroborative testimony on the value of such services because of Mr. Alpha’s singular knowledge of the process, we cannot say that the rate used by the trial judge is unreasonably excessive. Nor do we think that Mr. Alpha’s failure to keep accurate time records is fatal to his claim. It appears from the time records of his assistants that they spent over one hundred hours per machine and that time was on actual construction. Mr. Brian Alpha testified that Mr. Smith Alpha maintained regular supervision of the work and, of course, did work himself on some specialized parts. This did not include the designing work done prior to construction or the installations and service after a sale. We find that there was sufficient corroboration of the plaintiff’s estimate that he spent approximately one hundred hours per machine to justify the trial judge’s use of that estimate in computing the award.
For the above and foregoing reasons, the judgment appealed from is affirmed, at defendant-appellant’s costs.
Affirmed.